# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARIANNE ROCHELLE
THOMPSON,

       Plaintiff,

    vs.                                  Civ. No. 20-672 KK

ANDREW M. SAUL, Commissioner
of the Social Security Administration,

       Defendant.

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Marianne Rochelle Thompson's Complaint (Doc. 1) seeking review of the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration ("Commissioner") denying Ms. Thompson's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. (AR 35, 84.)[2] On February 26, 2021, Ms. Thompson filed a Motion to Reverse and Remand for Rehearing, with Supporting Memorandum ("Motion"). (Doc. 19.) The Commissioner filed a response in opposition on April 29, 2021, and Ms. Thompson filed a reply in support on May 13, 2021. (Docs. 21, 22.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and should be GRANTED.

---

[1] Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 7.)

[2] Citations to "AR" are to the Certified Transcript of the Administrative Record filed in this matter on December 18, 2020. (Doc. 14.)

# I.  <u>Legal Standards</u>

## A.      Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues de novo. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (quotation marks omitted). Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (quotation marks omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

## B.      Disability Benefits and the Sequential Evaluation Process

To qualify for DIB, a claimant must meet the Social Security Act's definition of "disability." 42 U.S.C. 423(a)(1)(E); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) she is not engaged in "substantial gainful activity"; *and* (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) her impairment(s) meet or equal one of the Listings of presumptively disabling impairments; *or* (4) she is unable to perform her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv). If the claimant can show that an impairment meets or equals a Listing at step three, the claimant's disability is established and the analysis stops. 20 C.F.R. § 404.1520(a)(4)(iii).

However, if at step three the claimant's impairment is not equivalent to a listed impairment, the ALJ must next consider all of the relevant medical and other evidence and determine what is the "most [the claimant] can still do" in a work setting despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1545(a)(1), (a)(3). The claimant's RFC is used at step four of the process to determine if she can perform the physical and mental demands of her past relevant work. 20 C.F.R.

§ 404.1520(a)(4)(iv), (e). In reaching a determination regarding the claimant's RFC, the ALJ must consider the limiting effects of *all* of the claimant's impairments, not only those found to be "severe" at step two. 20 C.F.R. § 404.1545(e). If the claimant establishes that she is incapable of meeting the demands of her past relevant work, the burden of proof then shifts to the Commissioner at step five to show that the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Grogan*, 399 F.3d at 1261.

## II. Background and Procedural History

### A. Factual Background

### 1. Introduction

Ms. Thompson is a high school graduate with specialized training in welding and firefighting. (AR 272.) For twenty years, she worked in the United States Navy as a shipboard firefighter and corrections officer. (AR 17, 1367.) After she was honorably discharged in 2005, she worked as a civilian corrections officer, a substitute teacher, a driver's helper, and a motor vehicle dispatcher. (AR 26, 48-49, 1315, 1367.) As a dispatcher, Ms. Thompson dispatched the delivery of portable buildings and addressed cancellations. (AR 17-18.)

Ms. Thompson alleges that she became disabled on January 1, 2017, at 56 years of age, due to an overactive bladder, chronic bilateral knee pain, right shoulder pain, and degenerative disc disease. (AR 36-37.) In an Adult Function Report she completed on August 20, 2018, she reported that she cannot stand or sit for an extended amount of time, climb stairs, lift more than 20 pounds, or bend over, and has shortness of breath as well as drowsiness due to her medications. (AR 322.) She further reported that her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, and complete tasks. (AR 327.)

At a hearing on March 4, 2020, Ms. Thompson testified that she is unable to return to work due to depression and because she cannot stand or sit for long periods of time, finish things she starts, or concentrate. (AR 18-19.) She also testified that arthritis in her left shoulder[3] prevents her from lifting any weight and limits her ability to reach overhead. (AR 24.) Ms. Thompson testified that she has nerve damage in her right hand, has had carpal tunnel surgery in both hands, has dropped things such as a pot of coffee, her phone, and dishes, and would rate the typical pain in her hands at 7 on a scale of 1 to 10. (AR 23-24.) She further testified that she has irritable bowel syndrome, which sometimes requires her to stay close to a toilet. (AR 24-25.) In short, according to Ms. Thompson, she has "issues with everything except for [her] feet." (AR 25.) Ms. Thompson's prescription medications as of August 2019 included baclofen for muscle spasm, celecoxib and gabapentin for pain, and oxybutynin for overactive bladder. (AR 1401.)

## 2. Ms. Thompson's Medical History[4]

### a. Knees

Ms. Thompson had surgery on her right knee in May 2012. (AR 459.) In October 2016, Ms. Thompson complained of diffuse pain in her left knee for three months and "catching and popping especially with rotational motions." (AR 463.) In November 2016, she complained of

---

[3] However, as discussed in Section II.A.2.d. below, the medical record evidence reflects that Ms. Thompson complained of bilateral shoulder pain, greater right than left, and that she was subsequently diagnosed with and received physical therapy for arthritis in her right shoulder.

[4] The record in this matter includes evidence outside the relevant time period. The Court briefly summarizes such evidence but does not rely on it in granting Ms. Thompson's Motion. *Cf. Overstreet v. Astrue*, No. 10-CV-656-TLW, 2012 WL 996608, at *9 (N.D. Okla. Mar. 23, 2012) ("Evidence outside the relevant time period may be considered to the extent that it assists the ALJ in determining disability during the relevant time period. Such evidence, however, is not dispositive because a finding of disability based solely upon evidence outside the relevant time period would be contrary to the Social Security Act which requires proof of disability during the time for which it is claimed.") (citation, quotation marks, and ellipses omitted) (citing *Hamlin*, 365 F.3d at 1215).

continuous, sharp, throbbing, and aching pain in her left knee at a level of 6 out of 10, as well as "clicking, instability, snapping/popping, night pain, pain with activities, and daytime pain with rest." (AR 467.) She told her doctor that her knee pain "started without specific injury event but has progressively interfered with her normal daily activities[,]" and that "[h]er symptoms are worse when standing, squatting, kneeling, sitting, climbing stairs, moving, lying supine, and walking." (AR 463, 467.) Ms. Thompson had surgery on her left knee in December 2016. (AR 472.) Her post-operative diagnosis was "[o]steoarthritis of the knee, [l]oose body in the knee joint, [and c]hronic tear of the medial meniscus[.]" (*Id.*) Following this surgery, Ms. Thompson "had a period of pain relief" but reported that her pain returned in 2017. (AR 645, 780, 495.)

Ms. Thompson received corticosteroid injections in her left knee in November 2017 and March 2018. (AR 645-46; 736-77.) In June 2018, Ms. Thompson reported that the effect of the first injection lasted 3.5 weeks, and the effect of the second lasted 2 weeks. (AR 647.) Provider records from 2017 to 2019 note tenderness and crepitus but also that Ms. Thompson's knee was stable under various tests and generally had a full range of motion. (AR 647, 1312, 1395, 1433; *but see* AR 646 (noting "L knee – ROM 0-120").) On November 27, 2017, a magnetic resonance image ("MRI") of Ms. Thompson's knee revealed "degenerative medial and lateral meniscal tears, full thickness cartilage loss in patellofemoral compartment. Some medial and lateral comp cartilage wear as well." (AR 646.) She received viscosupplementation injections in August 2018 and February 2019. (AR 1312, 1394.) On August 5, 2019, Ms. Thompson reported that she was no longer benefitting from these injections. (AR 1433.) X-rays taken of Ms. Thompson's left knee on that date revealed "[s]evere patellofemoral osteoarthritis." (AR 1419.)

**b.      Spine, Back, and Neck**

On February 9, 2016, Ms. Thompson told her primary care provider that she "developed neck pain about 2002." (AR 927.) She also reported that "[s]he had radiation and weakness mostly in [her] right arm and hand." (*Id.*) After being diagnosed with degenerative disc disease, she had surgery in "2003 and again about 1/2 a year later. She has had discectomy at two levels and has under gone [sic] fusion with plating and bone grafting." (*Id.*) Ms. Thompson "did well until about 2009 when she began to develop similar [symptoms]." (*Id.*) An MRI of Ms. Thompson's cervical spine taken on February 16, 2016 showed "[m]ultilevel cervical degenerative and postoperative changes . . . with moderate neural foraminal narrowing, on the right at the C2-C3, C5-C6 and Tl-T2 levels, on the left at the C3-C4 level, and bilaterally at the C4-C5 level." (AR 438-39.) An x-ray taken on the same date yielded the impression of "[m]id lumbar levoscoliosis and right L5-S1 facet joint sclerosis with possible neural foraminal narrowing." (AR 441.) Another MRI in July 2018 revealed

> [s]tatus post anterior fusion of C5, C6, and C7 with an overall satisfactory appearance. Disc osteophyte complex on the left at C3-C4 with some cord deformity and mild left foraminal stenosis. Broad-based disc osteophyte complex at C4-C5 without neurologic involvement. Uncovertebral arthritic changes on the right at C5-C6 with foraminal stenosis. Bulging disc on the right at T2-T3.

(AR 522.)[5]

c.      **Fingers, Hands, and Arms**

Ms. Thompson had median nerve decompression surgery for carpal tunnel syndrome in both hands in April 2011. (AR 424-26.) At that time, she complained of "neck pain, headaches and numb hands." (AR 423.) She reported symptoms again in 2016 and 2018, describing these as

---

[5] In discussing Ms. Thompson's back and neck pain, the ALJ cited to nine portions of the record for the proposition that "the claimant repeatedly presented in treating visits with normal range of motion, gait, motor strength, tone, and sensation." (AR 80.) However, one of these citations is to a record regarding Ms. Thompson's left knee, not her back or neck. (AR 647.)

"radiation and weakness mostly in right arm and hand[,]" (AR 927), "right arm tingling and numbness[,]" (AR 628, *see also* AR 1055), and "pain going down right arm and some tingling in 3 to 5th fingers which is new, 1-2 fingers numbness been there since cervical spine fusion." (AR 715-16.) In July 2018, her provider prescribed gabapentin for nerve pain. (*Id.*)

### d. Shoulders

From September 2017 to May 2018, Ms. Thompson complained of bilateral shoulder pain, right greater than left, "worse last 8 months." (AR 560, 730-31, 739, 780, 783.) X-rays taken in March 2018 revealed no abnormal findings in the left shoulder; however, in the right shoulder, Ms. Thompson's "AC joint show[ed] mild degenerative change with mild articular sclerosis and small osteophytes." (AR 561.) She attended twelve physical therapy sessions for her right shoulder from August to September 2018. (AR 1055-78, 1126-38.) At the inception of these sessions, Ms. Thompson reported the "onset of R shoulder pain sometime last year with gradual insidious onset" and "popping in R shoulder when she raises her arm above shoulder height. Pt. has difficulty pushing/pulling objects and working above shoulder height. Pt. wakes 3x/night due to R shoulder pain." (AR 1055.) At discharge, her physical therapists noted "slight reduction in R shoulder pain with [activities of daily living] and household chores[, . . . ] improved R [upper extremity] strength and tolerance to overhead activities in the clinic. . . . Despite pain complaints [patient] is able to perform functional tasks for longer periods of time." (AR 1137.) Ms. Thompson was discharged from physical therapy for her right shoulder to begin therapy for her left hip and was directed to continue with independent home exercises for her shoulder. (*Id.*)

### e. Hips

An x-ray of Ms. Thompson's pelvis in August 2018 led to a finding of "[m]ild osteoarthrosis of the left greater than right hips." (AR 557.) Ms. Thompson attended twelve

physical therapy sessions for her left hip from September to November 2018, at which her physical therapists usually noted: "Client demonstrates signs and symptoms consistent with symptomatic L hip [osteoarthritis]. History of L knee pain and altered gait mechanics likely contribute to progression of hip pathology." (AR 1182-1215.) At discharge on November 13, 2018, her physical therapists noted that Ms. Thompson "demonstrates improved L hip [range of motion] with continued slight deficit in L hip [external rotation] compared to R. [Patient] also has improved L. hip strength and knee strength." (AR 1214.) The physical therapists further noted that Ms. Thompson had "improved her overall tolerance to functional activities, despite high subjective disability report[,]" and had met three out of six of her physical therapy goals. (AR 1214.)

f.      **Urinary Tract**

On November 3, 2016, Ms. Thompson sought treatment for "urinary leakage for many years," and reported urinary frequency of 8 to 12 times per day and 4 times per night, along with leakage of urine with coughing, laughing, or sneezing. (AR 822.) Her provider increased her dose of oxybutynin and recommended behavioral or physical therapy. (AR 825.) She was referred to physical therapy on November 10, 2016, (AR 668), and attended three sessions between February and June 2017 with self-assessed 25 percent improvement. (AR 481-85.) Records from December 2019 indicate that Ms. Thompson continued to take oxybutynin at that time. (AR 1444-46.)

g.      **Prior Administrative Medical Findings Regarding Ms. Thompson's Physical Limitations**

On October 1, 2018, non-examining consultant Mark Werner, M.D., assessed at the initial level that Ms. Thompson had the RFC to occasionally carry 20 pounds, frequently carry 10 pounds, stand or walk about 6 hours per 8-hour workday, and sit about 6 hours per 8-hour workday. (AR 45-48.) He also concluded that she "[n]eeds restroom facilities readily available" and that she can

only occasionally push and pull due to arthritis, limited range of motion, pain, and mild weakness in her right shoulder. (AR 46, 48.) Regarding postural limitations, Dr. Werner assessed that Ms. Thompson was limited to occasionally stooping, kneeling, crouching, crawling, and climbing ramps, stairs, ladders, ropes, and scaffolds. (AR 46.) Regarding manipulative limitations, Dr. Werner assessed that Ms. Thompson was limited to occasionally reaching overhead due to her right shoulder arthritis. (AR 46-47.) On reconsideration, Janice Kando, M.D., agreed. (AR 63-66.)

### h. Medical Opinions and Prior Administrative Medical Findings Regarding Ms. Thompson's Mental Limitations

On November 26, 2018, examining psychologist Theresa Salazar, Psy.D, completed a "Medical Opinion[:] Disability Benefits Questionnaire" for the United States Department of Veterans Affairs ("VA") to evaluate "whether [Ms. Thompson's] medical records support that the claimed depressive disorder, is/are at least as likely as not (50 percent or greater probability) proximately due to or the result of [Ms. Thompson's] service connected disabilities[.]" (AR 1359-60, 1362 (capitalization omitted).) Dr. Salazar reviewed Ms. Thompson's VA file, conducted a clinical interview, and administered several psychological tests. (AR 1366.)

In response to the prompt, "[i]f the Veteran currently has one or more mental disorders that conform to DSM-5 criteria, provide all diagnoses[,]" Dr. Salazar listed "Depressive disorder due to another medical condition, [w]ith major depressive-like episode" and moderate alcohol use disorder. (AR 1364.) Dr. Salazar concluded that Ms. Thompson's depressive disorder was "secondary to service connected medical conditions[.]" (AR 1364.) She further indicated that Ms. Thompson's mental disorders caused "[o]ccupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood[.]" (AR 1365.) Under "Relevant Mental Health history[,]" Dr. Salazar noted that

[r]ecords from PHS 7/3/12 document diagnoses of Unspecified Depressive Disorder by her PCP with [prescription] of Effexor for Depression. She discontinued psychotropic medication due to negative side effects. She is prescribed multiple pain medications including [baclofen] and gabapentin for depression, pain as well as sleep disturbance. She suffers from multiple medical conditions and chronic pain rated at pain scale average of 8/10 which worsen her depression. Denied any history of formal mental health treatment.

(AR 1367.) She noted that Ms. Thompson's test results

all document moderate to severe levels of difficulty in the veterans [sic] symptoms on his [sic] personal, social and occupational functioning. [A]ctivities of daily living intact; however[,] veteran endorsed SEVERE difficulties in: joining community activities, walking long distances, dealing with people she doesn't know and maintaining friendships and how much she has been emotionally affected by problems.

(AR 1369 (capitalization in original).)

On January 17, 2019, psychologist David LaCourt, Ph.D., conducted a psychological evaluation of Ms. Thompson pursuant to a referral from the state Disability Determination Services Unit. (AR 1217.) Dr. LaCourt noted that Ms. Thompson's mental status at the evaluation was normal except for a "pessimistic and dysphoric mood" and "somatic centering[] on aches and pains of her neck and shoulder and at times radiating tingling/numbness down her arms, especially, but also of the knees." (AR 1218.) Dr. LaCourt administered the WAIS-IV, which indicated that Ms. Thompson's intellectual functioning was "within the broad average range overall, although perceptual reasoning is in the high-average portion and working memory as well as processing speed are within the low-average portion." (AR 1219.)

Dr. LaCourt's diagnostic impression was of "Somatic Symptom Disorder, persistent, with predominant pain, moderate severity[.]"[6] (AR 1219.) He opined that Ms. Thompson is moderately

---

[6] "Somatic symptom disorder (SSD) occurs when a person feels extreme, exaggerated anxiety about physical symptoms. The person has such intense thoughts, feelings, and behaviors related to the symptoms, that they feel they cannot do some of the activities of daily life. They may believe routine medical problems are life threatening. This anxiety may not improve despite normal test results and reassurance from the health care provider. A person with SSD

limited in the following abilities: (1) "sustained concentration/ task persistence, for carrying out instructions" and "working without supervision"; (2) "social interaction" with coworkers and supervisors; and, (3) "aware[ness] of normal hazards/reacting appropriately." (AR 1219.) Dr. LaCourt associated the limitation on carrying out instructions with "pain-related task impersistence," and the limitation on working without supervision with "impersistence/ frequent breaks."[7] (AR 1219.)

On February 26, 2019, non-examining consultative psychologist Mark McGaughey, Ph.D., evaluated Ms. Thompson's "somatic symptom and related disorders" by completing a Psychiatric Review Technique form. (AR 43-44.) He concluded that she is not limited in her abilities to interact with others or to adapt or manage herself, and is only mildly limited in her abilities to "[u]nderstand, remember, or apply information" and to "[c]oncentrate, persist, or maintain pace[.]" (AR 43.) On reconsideration on June 20, 2019, non-examining consultative psychiatrist Scott R. Walker, M.D., agreed. (AR 60-61.)

## B.    Procedural History

Ms. Thompson applied for DIB on July 5, 2018. (AR 36, 69.) She alleged a disability onset date of January 1, 2017, and her date last insured is December 31, 2021. (AR 36.) Disability Determination Services found that Ms. Thompson was not disabled, both initially and on reconsideration. (AR 36-68.) Ms. Thompson requested a hearing before an ALJ on the merits of her application. (AR 103-04.)

---

is not faking their symptoms. The pain and other problems are real. They may be caused by a medical problem. Often, no physical cause can be found. However, it is the extreme reaction and behaviors about the symptoms that are the main problem." https://medlineplus.gov/ency/article/000955.htm (last visited Jun. 21, 2021).

[7] Dr. LaCourt also opined that Ms. Thompson is up to mildly limited in the abilities to understand and remember detailed/complex verbal instructions, attend and concentrate, have short interactions with the public, adapt to changes in the workplace, and use public transportation/travel to unfamiliar places. (AR 1219.)

ALJ Jennifer Fellabaum conducted a hearing in Albuquerque on March 4, 2020. (AR 9-34.) The ALJ took testimony from Ms. Thompson, who was represented by attorney Aaron William Fields, and from impartial vocational expert ("VE") Leslie J. White. (AR 16, 26.) On April 7, 2020, the ALJ issued an unfavorable decision. (AR 70.) On May 15, 2020, the Appeals Council denied Ms. Thompson's request for review, making the ALJ's decision the Commissioner's final decision from which Ms. Thompson now appeals. (AR 1.)

## C.     The ALJ's Decision

The ALJ determined at step one of the sequential evaluation process that Ms. Thompson had not engaged in substantial gainful activity since her alleged onset date. (AR 75.) At step two, she found that Ms. Thompson has the severe impairments of: "osteoarthritis and meniscus tears of the knees status post arthroscopic repair, degenerative disc disease, bilateral carpal tunnel syndrome status post median nerve decompression, bilateral hip osteoarthritis, and right shoulder degenerative joint disease[.]" (AR 75.) The ALJ noted that Ms. Thompson "alleges additional impairments and the record shows she has been treated or evaluated for other symptoms and complaints that appear periodically throughout the record[,]" including "cataracts, diverticulosis, hemorrhoids, irritable bowel syndrome, hypothyroidism, diabetes mellitus, left ankle fracture, obstructive sleep apnea, somatoform disorder, depression, and alcohol use disorder." (AR 76.) However, the ALJ concluded that these conditions "do not constitute severe medically determinable impairments" because, considered singly or together, they "have caused only transient and mild symptoms and limitations, are well controlled with treatment, have not met the 12-month-durational requirement, or are otherwise not adequately supported by the medical evidence in the record." (*Id.*)

The ALJ determined at step three that Ms. Thompson's impairments do not meet or medically equal the severity of one of the listings described in 20 C.F.R. Part 404, Subpart P., Appendix 1. (AR 77.) As a result, the ALJ proceeded to step four, at which she found that Ms. Thompson has the RFC

> to perform sedentary work as defined in 20 CFR 404.1567(a) except occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds, or be exposed to unprotected heights or hazardous machinery; occasionally reach overhead bilaterally; frequently finger, handle and feel bilaterally; occasionally use foot controls bilaterally; and cannot perform fast paced production work.

(AR 78.) The ALJ also found at step four that Ms. Thompson is able to perform her past relevant work as a dispatcher. (AR 83.) Therefore, the ALJ concluded that Ms. Thompson is not disabled and did not proceed to step five. (AR 84.)

## III. <u>Analysis</u>

### A. The ALJ erred by rejecting Dr. LaCourt's opinions in part without adequate explanation.

Ms. Thompson argues that the ALJ committed reversible error by rejecting some of the moderate limitations Dr. LaCourt assessed without explanation. (Doc. 19 at 13-15; Doc. 22 at 8.) The Commissioner responds that the ALJ's discussion of Dr. LaCourt's opinions was sufficient under the agency's new regulations, and that any error in her treatment of these opinions was harmless. (Doc. 21 at 19.) As explained below, the Court agrees with Ms. Thompson.

### 1. Applicable Law

Where a medical source assesses a "moderate limitation" on a claimant's ability to perform an activity, the assessment indicates that the claimant's ability is impaired. *See* Social Security Administration, Program Operations Manual System ("POMS"), DI 24510.063(B)(2) (1994) (providing that the box for "moderately limited" on the mental RFC assessment form should be

checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired"); *Bowers v. Astrue*, 271 F. App'x 731, 733-34 (10th Cir. 2008) (unpublished) (noting that the claimant's "eight moderate impairments" may have "decreased her ability to perform [simple] work"); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[A] moderate impairment is not the same as no impairment at all.").

An ALJ may account for moderate limitations that a medical source assesses "by limiting the claimant to particular kinds of work activity" in the ALJ's RFC determination at step four. *Smith v. Colvin*, 821 F.3d 1264, 1269 (10th Cir. 2016). When the ALJ does not do so, but instead assigns an RFC that contradicts a medical source opinion, the ALJ must explain why she did not account for the medical opinion in her RFC determination. *Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) (unpublished) ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence."). Where the ALJ does not adequately explain her rejection of a medical source opinion concerning the claimant's RFC, the case must be remanded for the ALJ to do so. *Haga*, 482 F.3d at 1208-09; *Frantz v. Astrue*, 509 F.3d 1299, 1302-03 (10th Cir. 2007); *Givens*, 251 F. App'x at 568.

In *Haga*, 482 F.3d at 1207, a consulting mental health professional completed a mental RFC form "on which he marked [the claimant] moderately impaired in seven out of ten functional categories." The ALJ "rejected four of the moderate restrictions . . . while appearing to adopt the others." *Id.* at 1208. Because the ALJ did not explain why he did so, the court remanded "so that the ALJ can explain the evidentiary support for his RFC determination." *Id.* at 1208-09. The Court noted that the consultant's opinion was uncontradicted and that "the evidence on which the ALJ explicitly relied in his decision does not imply an explanation for rejecting any of [the consultant's]

restrictions on the mental RFC form, and, in fact, the ALJ never stated that he rejected [the consultant's] opinion." *Id.* at 1208. Thus, because it was "simply unexplained why the ALJ adopted some of [the consultant's] restrictions but not others[,]" remand was appropriate. *Id.* at 1208-09; *see also Frantz*, 509 F.3d at 1302-03 ("[T]he ALJ erred in accepting some of the moderate limitations in the Mental RFC form . . . but rejecting others without discussion.").

As the Commissioner points out, (Doc. 21 at 6-8), the Social Security Administration has issued a new regulation regarding the evaluation of medical source opinions for DIB claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017") *with* 20 C.F.R. § 404.1520c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). Because Ms. Thompson filed her claims in 2018, the new regulation applies to this matter. (AR 36, 69.)

The new regulation provides that the agency "will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record." 20 C.F.R. § 404.1520c(b). Addressing the agency's new "articulation requirements," the regulation states that,

> when a medical source provides multiple medical opinion(s) [sic] . . . we will articulate how we considered the medical opinions . . . from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion . . . from one medical source individually.

20 C.F.R. § 404.1520c(b)(1). The regulation further provides that

> [t]he factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions . . . in your

16

determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions . . . in your case record.

20 C.F.R. § 404.1520c(b)(2). "[T]he factors in paragraphs (c)(3) through (c)(5)" are the source's "[r]elationship with the claimant," the source's "[s]pecialization," and "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c)(3)-(c)(5).

In the Court's view, the agency's new regulation does not alter the Tenth Circuit's requirement that an ALJ must explain her rejection of any medical source opinions in the record concerning the claimant's RFC. *Haga*, 482 F.3d at 1208-09; *Frantz*, 509 F.3d at 1302-03; *Givens*, 251 F. App'x at 568. This requirement flows from the premise that an ALJ's decision must "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [she] rejects," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996), in order to provide the Court "with a sufficient basis to determine that appropriate legal principles have been followed[.]" *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). The requirement enables the courts to engage in meaningful judicial review of agency decisions and thus exists independently of agency regulations.

This explanation requirement applies to medical opinions that concern a claimant's RFC, *i.e.*, medical opinions relevant to a claimant's "ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted). The "[m]ental [a]bilities [n]eeded [f]or [a]ny [j]ob" include "[t]he ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)." POMS DI 25020.010 (2007). Similarly, the abilities to

interact appropriately with supervisors and coworkers are work-related mental abilities "critical to all work, and the ALJ must adequately address [them] in the RFC." *See Bennett v. Berryhill*, No. 1:16-CV-00399-LF, 2017 WL 5612154, at *7 (D.N.M. Nov. 21, 2017); POMS DI 25020.010(B)(2)(c). Where an ALJ rejects a medical opinion that addresses a claimant's abilities in these areas on account of other conflicting record evidence, the ALJ must explain her rejection of the medical opinion as part of her obligation to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7.

### 2. The ALJ's RFC determination does not account for moderate limitations Dr. LaCourt assessed.

The ALJ excluded moderate limitations assessed by Dr. LaCourt from her RFC determination. As stated above, Dr. LaCourt opined that Ms. Thompson is moderately limited in the following abilities: (1) "sustained concentration/ task persistence, for carrying out instructions" and "working without supervision"; (2) "social interaction" with coworkers and supervisors; and, (3) "aware[ness] of normal hazards/reacting appropriately." (AR 1219.) At most, the ALJ's RFC determination partially acknowledged a limitation on Ms. Thompson's abilities to concentrate and persist by barring "fast paced production work." (AR 78, 81.) Also, the ALJ may have partially accommodated the moderate limitation Dr. LaCourt assessed on Ms. Thompson's ability to be aware of and react appropriately to normal hazards in the workplace by barring Ms. Thompson from climbing ladders, ropes, or scaffolds or being exposed to unprotected heights or hazardous machinery. (AR 78, 1219.) At most, these are partial acknowledgements, and they nonetheless leave Dr. LaCourt's moderate limitations on Ms. Thompson's abilities to work without supervision and interact with coworkers and supervisors entirely unaccounted for. Therefore, the ALJ rejected

Dr. LaCourt's opinions in part by failing, in Ms. Thompson's RFC, to account for limitations he

assessed. *See Haga*, 482 F.3d at 1208 (treating limitations assessed by medical source but omitted

from RFC as rejected).

**3. The ALJ did not adequately explain why she rejected Dr. LaCourt's assessed limitations.**

The ALJ rejected Dr. LaCourt's opinions without adequate explanation. The ALJ's

relevant discussion is as follows:

> With respect to the claimant's mental functioning, David LaCourt, Ph.D., an
> independent consultative examiner, concluded on January 17, 2019, that the
> claimant [has] none to mild limitation in all areas of mental functioning except with
> respect to social interaction, working without supervision, and sustaining
> concentration/task persistence (Ex. 20F/4). In these areas, Dr. LaCourt concluded
> that the claimant has moderate limitation. He attributed these limitations to pain-
> related task impersistence and frequent breaks. She exhibited somatic centering on
> her aches and pains, but no other preoccupations were identified.

> Meanwhile, Mark McGaughey, Ph.D., a State agency consultant, concluded on
> February 26, 2019, that the claimant has no more than mild limitation . . . in any of
> the four broad areas of mental functioning set out in the disability regulations for
> evaluating mental disorders and in the mental disorders listings in 20 CFR, Part
> 404, Subpart P, Appendix 1 (Ex. 2A/8). On reconsideration, Scott R. Walker, M.D.
> agreed in an opinion dated June 20, 2019 (Ex. 3A/11). In support of these
> assessments, the doctors noted that the claimant was not in treatment for a mental
> impairment (Ex. 2A/9, Ex. 3A/11). They also noted that the claimant's mental
> status and intellectual functioning was generally normal during an independent
> consultative examination in January 2019 (Ex. 3A/11). They further note that [Dr.
> LaCourt's] opinion is related to the claimant's physical conditions and outside of
> his area of expertise.

> These opinions are persuasive. All of these doctors are familiar with the
> requirements of the Social Security disability program, reviewed the evidence that
> was made available to them, and made reasonable, well-supported conclusions
> based on that evidence. Dr. LaCourt had the additional advantage of personally
> evaluating the claimant. While the limitations he identified were outside the scope
> of his evaluation, the record supports a finding that pain interferes with the
> claimant's concentration, persistence, and pace. This conclusion is supported by his
> observation that the claimant centered on somatic complaints and a note from the
> claimant's physical therapist that she continued to report high subjective perception
> of disability (Ex. 19F/91, Ex. 20F/3). Meanwhile, the record [sic] repeatedly denied

symptoms of depression or anxiety and did not present with signs of either (Ex. 3F/19, Ex. 9F/12, Ex. 14F/171, 173, 194, 196, 236, 237, 262, 263, 417, Ex. 22F/15, Ex. 24F/46, 64). For these reasons, I find that all of these opinions are supported by and consistent with the objective evidence on record.

(AR 81-82.) As explained below, isolated statements in this discussion suggest possible reasons why the ALJ rejected Dr. LaCourt's assessed limitations, but each possibility is (a) contradicted by other statements the ALJ made, such that the Court is left with no coherent explanation, (b) unsupported by substantial evidence, or both.

First, the ALJ's citation to the opinions of Drs. McGaughey and Walker—opinions that contradict Dr. LaCourt's assessed limitations—suggests that the ALJ may have rejected Dr. LaCourt's opinions because she found them less persuasive than the opinions of Drs. McGaughey and Walker. Similarly, the ALJ's citation to Drs. McGaughey and Walker's statements that Dr. LaCourt's opinions were "outside of his area of expertise" raises the possibility that the ALJ rejected Dr. LaCourt's opinions because she agreed that they were "outside of his area of expertise" and therefore unpersuasive. (AR 82.) However, the ALJ specifically stated that all three sources' opinions were "persuasive" and "supported by and consistent with the objective evidence on record." (*Id.*) Further, the ALJ wrote that Drs. LaCourt, McGaughey, and Walker were all "familiar with the requirements of the Social Security disability program, reviewed the evidence that was made available to them, and made reasonable, well-supported conclusions based on that evidence." (*Id.*) Indeed, the ALJ's statement that Dr. LaCourt "had the additional advantage of personally evaluating the claimant" suggests that she found Dr. LaCourt's opinions *more* persuasive than the opinions of Drs. McGaughey and Walker. (*Id.*) Therefore, in light of the ALJ's discussion as a whole, her citation to the opinions of Drs. McGaughey and Walker does not adequately explain

why she rejected Dr. LaCourt's assessed limitations. *See Givens*, 251 F. App'x at 568; *Jensen*, 436 F.3d at 116.

Further, to the extent the ALJ intended to find that Dr. LaCourt's opinions were in fact "outside of his area of expertise[,]" insufficient evidence would have supported such a finding. Dr. LaCourt is a psychologist, (AR 1220), and his opinions concerned Ms. Thompson's *mental* limitations in light of his diagnosis of "Somatic Symptom Disorder," a *mental* disorder described in the "DSM-5," *i.e.*, the Diagnostic and Statistical Manual of Mental Disorders, fifth edition. (AR 1219); *see* Am. Psychiatric Ass'n, "What Is Somatic Symptom Disorder?" at https://www.psychiatry.org/patients-families/somatic-symptom-disorder/what-is-somatic-symptom-disorder (last visited Jun. 27, 2021) (individual with somatic symptom disorder "has excessive thoughts, feelings and behaviors relating to . . . physical symptoms," that "may or may not be associated with a diagnosed medical condition," though the person "is experiencing symptoms and believes they are sick"). Dr. LaCourt was not required to evaluate Ms. Thompson's "physical conditions" to assess that Ms. Thompson's somatic symptom disorder limited her work-related mental abilities, because somatic symptom disorder can be present even when a patient's symptoms are not associated with a diagnosed medical condition. *Id.*; (AR 82.) Accordingly, Dr. LaCourt did not evaluate any physical conditions; rather, he observed that "[t]here was somatic *centering*[] on aches and pains of [Ms. Thompson's] neck and shoulder and at times radiating tingling/ numbness down her arms, especially, but also of the knees." (AR 1218 (emphasis added).) In other words, Dr. LaCourt only assessed Ms. Thompson's *psychological experience* of somatic symptoms in his evaluation; therefore, a reasonable mind would not accept the record evidence as adequate to support a finding that the limitations to which he opined were outside his area of expertise. *See Langley*, 373 F.3d at 1118.

The Court also notes the ALJ's statement that "the limitations [Dr. LaCourt] identified were outside the scope of his *evaluation*[.]" (AR 82 (emphasis added).) The ALJ does not cite to the record in support of this statement, and the Court's own review of the record does not reveal any evidence to support it. Ms. Thompson was referred to Dr. LaCourt "for psychological evaluation through the Disability Determination Services Unit of the State of New Mexico. Issues at referral included overactive bladder, chronic bilateral knee pain, right shoulder pain, degenerative disk disease and memory/concentration difficulties." (AR 1217.) Although not specifically listed as an "[i]ssue[] at referral[,]" whether and how Ms. Thompson's mental condition limits her work-related mental abilities is squarely within the scope of a psychological evaluation conducted for the Disability Determination Services Unit. (*Id.*) Further, Dr. LaCourt's diagnosis of somatic symptom disorder and assessment of mental limitations directly addressed Ms. Thompson's "memory/concentration difficulties." (*Id.*) Moreover, whatever the agency might have anticipated the precise scope of his evaluation would be, the limitations Dr. LaCourt assessed were certainly well within the scope of the evaluation he ultimately produced. Therefore, the ALJ's contrary finding is unsupported by substantial evidence. *See Langley*, 373 F.3d at 1118.

No other portion of the ALJ's decision implies an adequate explanation for rejecting Dr. LaCourt's opinions. The ALJ did find, at step two, that Ms. Thompson "has no more than mild limitations in the four broad functional areas set out in the disability regulations for evaluating mental disorders." (AR 77.) However, in so stating, the ALJ actually cited to Dr. LaCourt's findings with approval, and neither expressly nor impliedly identified any reason why any of his opinions should be rejected. (*Id.*, citing AR 1217-20.) In sum, the ALJ failed to adequately explain why the RFC she assigned to Ms. Thompson did not account for the moderate limitations on work-related mental abilities to which Dr. LaCourt opined. *Haga*, 482 F.3d at 1208. Therefore, reversal

is necessary. *See id.* at 1208-09; *cf. Winfrey*, 92 F.3d at 1024, 1026 (reversing based in part because, "[a]lthough the ALJ stated that he found entirely credible [the plaintiff's treating physician's] opinion [regarding the plaintiff's limitations], the ALJ did not include any of these limitations in his determination of plaintiff's RFC").

**B.      The ALJ's error was not harmless.**

The Commissioner argues that any error in the ALJ's treatment of Dr. LaCourt's opinions was harmless. (Doc. 21 at 19.) The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless,

> harmless error analysis . . . may be appropriate to supply a missing dispositive finding where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.

*Id.* at 733-34 (quotation marks, alteration, and citation omitted). The failure to provide adequate reasons for rejecting a medical opinion "involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578-79 (10th Cir. 2014). In that situation, the claimant is not prejudiced because the outcome would have been the same even if the medical opinion were not rejected. *See id.* at 579.

Here, however, Dr. LaCourt's assessment of moderate limitations on Ms. Thompson's work-related mental abilities on the one hand, and the ALJ's RFC determination on the other, are inconsistent: the RFC determination largely fails to account for the limitations Dr. LaCourt assessed. (*Compare* AR 78 *with* AR 1219.) Had the ALJ accounted for Dr. LaCourt's opinions regarding Ms. Thompson's limitations, she would likely have assigned Ms. Thompson a more restrictive RFC. Moreover, as the ALJ herself observed, ample record evidence supports Dr.

LaCourt's opinions, such that the Court cannot "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *See Fischer-Ross*, 431 F.3d at 733-34.

Further, a more restrictive RFC with respect to Ms. Thompson's work-related mental abilities may have resulted in a different outcome. The VE testified that a hypothetical employee would be unable to perform Ms. Thompson's past relevant work or "other jobs in the national economy" if he or she would be off task more than ten percent of the work day or could not "meet the production requirements of [his or her] job." (AR 28-29.) This suggests that a more restrictive RFC with respect to concentration and task persistence may have resulted in a finding of disability. Likewise, the abilities to interact with supervisors and coworkers are among the mental abilities needed for any job. *See* POMS DI 25020.010(B)(2)(c); *see also Bennett*, 2017 WL 5612154, at *7. In particular, all of these abilities would seem to be necessary for the past relevant work the ALJ found Ms. Thompson able to perform, *i.e.*, a motor vehicle dispatcher for the delivery of portable buildings.[8] (AR 83-84; *see* AR 17-18.) Thus, an RFC providing for greater restrictions on these abilities would likely have resulted in different findings at steps four and five, and the ALJ's failure to adequately explain her rejection of Dr. LaCourt's opinions was not harmless. *Mays*, 739 F.3d at 578-79.

## C.    Remaining Claims

---

[8] Notably, in her decision the ALJ did not "make specific findings about the mental . . . demands of [Ms. Thompson's past relevant work] and . . . evaluate [Ms. Thompson's] ability to meet those demands" in light of her mental impairments. *Winfrey*, 92 F.3d at 1025. Indeed, the ALJ did not even address Ms. Thompson's ability to meet the mental demands of her past relevant work in light of the ALJ's own conclusion that Ms. Thompson "would have some difficulty with concentration and . . . should not be place[d] in a job that requires fast-paced production work." (AR 81.) Rather, she merely cited to the VE's general testimony that a person of Ms. Thompson's age, education, work experience, and RFC would be able to perform her past relevant work as a dispatcher and then discussed in greater detail the manipulative activities that job requires. (AR 83-84.)

The Court will not address Ms. Thompson's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *See Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### IV. Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Ms. Thompson's Motion to Reverse and Remand for a Rehearing (Doc. 19) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent